

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 5, 2019

**BY ECF**
The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:  **United States v. Tourey Rufai, S1 18 Cr. 201 (DLC)**

Dear Judge Cote:

The defendant in the above-captioned case, Tourey Rufai, is scheduled to be sentenced on April 12, 2019 at 11:00 a.m., after pleading guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  The Government respectfully submits this letter in advance of the sentencing and in response to the defendant's sentencing submission filed on March 29, 2019 (ECF No. 70) ("Def. Mem.").

As an initial matter, the Government does not have any objections to the Presentence Investigation Report revised on April 2, 2019 (the "PSR"), which determined that the defendant's applicable United States Sentencing Guidelines (the "Guidelines") sentence is 41 to 51 months' imprisonment.  (PSR ¶ 129.)  For the reasons set forth below, the Government respectfully submits that the Court sentence the defendant to a term of imprisonment within the Guidelines sentencing range, which would be sufficient but not greater than necessary to serve the purposes of sentencing and would be fair and appropriate in this case.

## I.   APPLICABLE LAW

As the Court is aware, the Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory.  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 49 (2007).  As the Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice."  *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Hon. Denise L. Cote
April 5, 2019
Page 2 of 7

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall,* 552 U.S. at 50).

## II.    DISCUSSION

The Government respectfully submits that the application of the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) supports the imposition of a Guidelines sentence of 41 to 51 months' imprisonment.

### A.    The Seriousness of the Defendant's Conduct

First, a sentence within the Guidelines range is necessary to reflect the seriousness of the defendant's conduct and to provide just punishment for the offense. Here, the defendant was a member of a criminal enterprise (the "Enterprise") based in Ghana that was involved in defrauding more than 100 American businesses and individuals of more than $10 million through business email compromises and romance scams, the general details of which are discussed at length in the PSR. (*See* PSR ¶¶ 22-23.) Based on information known to the Government, the defendant was an integral member of the conspiracy for at least approximately 3.5 years, beginning in at least September 2014 through the date of his arrest in January 2018. He was responsible for opening bank accounts to receive the funds stolen from victims and laundering them to coconspirators based in Ghana. The defendant opened some of these bank

Hon. Denise L. Cote
April 5, 2019
Page 3 of 7

accounts in fake names using fake passports (see Exhibit A), including at least two accounts in the name "Joe Terry" and one account in the name "Joe Thompson." The defendant also received fraud proceeds through Moneygram, Western Union, and other money transfer companies. In total, Rufai received more than approximately $730,000 in fraud proceeds from at least 25 victims whose names could be identified in eight different banks accounts that he controlled. In exchange for his work with the Enterprise, Rufai received a cut of typically 15% to 30% of the amount of fraud proceeds he received and laundered. In terms of relative culpability of the five defendants charged, Rufai is the third most culpable based on his role in the conspiracy and the loss amount and number of victims. (*See id.* ¶¶ 45-49.)

As a single example of one of the many transactions the defendant was involved in, in or around November 2017, an employee of a real estate company in Manhattan ("Victim-1") received fraudulent emails from individuals purporting to be a known lawyer for Victim-1 and a second known individual who oversaw Victim-1's finances. Those emails, which were sent by members of the Enterprise as part of a business email compromise, directed the employee to transfer a total of over $750,000 to three different bank accounts. (PSR ¶ 86.) One of those three bank accounts that received funds from Victim-1 was controlled by a 69-year-old single woman ("Victim-2") residing in Wisconsin who was the victim of a romance scam. (*Id.* ¶ 28.) Victim-2 was led into believing that she was in an online relationship with a purported male individual who convinced Victim-2 through false statements to send both her own money and the money she received from Victim-1 to other members of the Enterprise, including the defendant and codefendant Muftau Adamu. Victim-2 was therefore unwittingly used to launder the fraud proceeds received from Victim-1. When Victim-2 deposited $46,500 in fraud proceeds into Rufai's account in the name of "Joe Thompson," Adamu told Rufai that it was "time for pick up" and expressed the need to have a "fresh account" to receive the funds to avoid problems. (*See* Exhibit B.) They also agreed that Rufai would receive 15% of the funds as his cut, or approximately $6,975. (*Id.*) Rufai subsequently withdrew most of the funds through a $12,000 cash withdrawal; a $20,000 cashier's check made out to Hudeiya Adjei, the mother of the defendant's daughter (PSR ¶ 87); and another $13,633 cashier's check made out to "Joe Thompson" (*id.* ¶ 27(c)).

Importantly, the defendant communicated extensively with other members of the Enterprise in connection with the conspiracy. Specifically, based on the Government's searches of the two phones seized at the time of the defendant's arrest, Rufai passed on information for the bank accounts in fake names that he controlled to at least 30 other individuals, many of whom were in Ghana. His text messages with those individuals total more than 2,000 pages in length and primarily concern his receipt and laundering of fraud proceeds. The Government has attached a sample of some of these text messages with a *single* coconspirator ("CC-1") which are briefly summarized below:

- Exhibit C: After CC-1 describes to Rufai how he commits romance scams, Rufai responds by stating, "This business be outstanding."

- Exhibit D: CC-1 and Rufai discuss fraudulent transfers via Moneygram from a more than 60-year-old romance scam victim ("Victim-3"). Victim-3 was led into

Hon. Denise L. Cote
April 5, 2019
Page 4 of 7

> believing that she was in an online relationship with a purported male individual who convinced her through false statements to send money so that the body of friend who was accidentally killed could be sent to his family.

- Exhibit E:  Rufai instructs CC-1 to give the fake name "Joe Terry" to a romance scam victim so that Rufai can receive the funds from the victim.

- Exhibit F:  Rufai and CC-1 discuss the laundering of fraud proceeds to Ghana through the purchase of expensive ("serious") cars and "important things" in the United States which are shipped to Ghana and resold.  Rufai states that one of his guys can assist with laundering the money through car purchases.

These text messages reveal that the defendant was not simply aware that he was receiving fraud proceeds, but that he was aware of the exact nature of the frauds being perpetrated to obtain the funds from victims and how to launder those funds to Ghana without being detected.

Moreover, as demonstrated above, the defendant's statement that he "made no profit from his involvement" in the conspiracy and that "*all* of the proceeds were sent back to the other co-conspirators in Ghana" is simply false.  (Def. Mem. at 14 (emphasis added).)  Indeed, not only does this statement contradict the defendant's own written statement to the Court but it also contradicts his plea allocution where he admitted to keeping some of the fraud proceeds for himself.   The Government has also attached a few other examples of text message chats in which the defendant told coconspirators that he charged between 20% and 30%.  (*See* Exhibits G and H.)  For example, in Exhibit G, the defendant explains that he is charging 30% because of the risk that the account, which he claimed was "very clean like snow," will be closed ("spoiled") due to the fraudulent activity.  Assuming that the defendant conservatively earned 15% of the approximately $730,000 that went through his bank accounts, he made a profit of more than $100,000 from his involvement in the conspiracy.

As described above, this extensive conduct by the defendant over 3.5 years in receiving and laundering more than approximately $730,000 in fraud proceeds from at least 25 victims is serious.[1]  Moreover, unlike some other members of the conspiracy, the defendant acted with full knowledge of the types of frauds being committed, even commenting how it was "outstanding." The defendant's claims that he "did not contemplate" the ways his crimes affected others and that he did not realize "the financial loss to the victims [was] real" (Def. Mem. at 14) rings hollow in light of the extensive discussion of the frauds in his communications with coconspirators.  Real victims were indeed hurt by the crimes committed by the defendant and his role in the conspiracy, which was integral to committing the frauds and getting the money to coconspirators in Ghana.  For instance, many of the romance scam victims, who were more than 60 years old and were taken advantage of because of their particular vulnerability, lost a

---

[1] The Government is currently in the process of ascertaining victims' losses and obtaining sufficient information to permit the Court to fashion an appropriate restitution order.  *See* 18 U.S.C. § 3664(a) and (d)(5).  The Government will provide this information to the Court as soon as practicable.

Hon. Denise L. Cote
April 5, 2019
Page 5 of 7

significant portion if not all of their retirement savings through the frauds committed by the Enterprise.  For these reasons, the seriousness of the defendant's conduct and the need to provide just punishment warrant a Guidelines sentence of imprisonment.

**B.      The Need for Adequate Specific Deterrence**

Second, a significant sentence of imprisonment within the Guidelines range is necessary for specific deterrence to this defendant and to protect the public from further crimes of the defendant.  During his 3.5 years involved in the instant offense, Rufai was gainfully employed, was purportedly married and had a young daughter, and was seeking asylum in the United States on the basis that he would be killed if he returned to Ghana.  The defendant also appears to have had the support of several family members and friends, many of whom wrote letters to the Court in connection with this sentencing.  Nevertheless, despite all of this support and the fact that the defendant was certainly aware of the potential legal consequences of his criminal conduct, the defendant chose to engage in the instant offense within approximately a year of arriving in the United States and six months of submitting his asylum application, thereby placing his ability to stay in the United States and be with his family at risk.  The fact that the defendant would put so much at risk despite what appears to be substantial family support and a strong need to remain in the United States is indicative of the need for specific deterrence.   Accordingly, a sentence within the Guidelines range is necessary to discourage the defendant from committing further crimes following his release from prison and to impress upon him the serious consequences of his criminal conduct.

**C.      The Need for General Deterrence and Respect for the Law**

Third, a Guidelines sentence of imprisonment is appropriate to ensure adequate general deterrence and to promote respect for the law.  As Exhibit C to the defendant's submission notes, this case has attracted some media attention in Ghana.  A prison sentence within the Guidelines range is necessary to send a message to other similarly situated individuals and the public that participating in business email compromises and romance scams in any capacity will not be treated leniently and will entail a significant period of incarceration.  Such a message is particularly important at a time when such crimes, which are often difficult to prosecute, have become commonplace.  Indeed, in 2018, the Better Business Bureau estimated that there were more than one million victims of romance scams in the United States who collectively lost over $1 billion over the last three years.[2]  Also in 2018, people reported losing $143 million to romance scams to the Federal Trade Commission ("FTC"), which is a higher total than for any other type of scam reported to the FTC.[3]  Further, based on data collected by the FBI, between October 2013 and May 2018, U.S. victims lost a total of approximately $3 billion to business email compromises, which have been increasing since December 2016.[4]  It is therefore important that those who would consider engaging in these forms of criminal conduct understand that the

---

[2] *See* https://www.bbb.org/article/news-releases/17057.

[3] *See* https://www.consumer.ftc.gov/blog/2019/02/romance-scams-will-cost-you

[4] *See* https://www.ic3.gov/media/2018/180712.aspx

Hon. Denise L. Cote
April 5, 2019
Page 6 of 7

consequences will be serious.  Accordingly, a sentence within the Guidelines range is both
necessary and appropriate to promote general deterrence and respect for the law.

### D.     The Defendant's Requested Sentence of Probation Is Wholly Inadequate

The defendant seeks a non-incarceratory sentence of probation primarily on the basis of
his background and history, including his journey to the United States to seek asylum, and the
need for him to continue to care for his two young children.  In light of the other sentencing
factors discussed above, a sentence of probation is wholly inappropriate.

First, the defendant spends almost half of his submission describing the poor conditions
under which he was raised in Ghana and his journey to the United States to seek asylum after
helping a friend.  (Def. Mem. 3-12.)  The Government is sympathetic to the difficult
circumstances surrounding the defendant's upbringing in Ghana and his arrival in the United
States.  However, the defendant's offense conduct in this case, which spanned more than three
years, reflects the defendant's extensive involvement in a widespread conspiracy that through his
conduct alone resulted in over $730,000 in losses to at least 25 victims.  This was not a one-time
mistake or "aberration" that can be excused by the defendant's otherwise law-abiding life.  (*See*
Def Mem. at 17.)  Rather, since he arrived in the United States and was released from
immigration custody in June 2013 (PSR ¶ 86), the defendant has spent approximately 3.5 of the
4.5 years of his time in the United States prior to his arrest engaged in calculated and deliberate
criminal activity.  The fact that the defendant was able to go one year in the United States
without being caught engaging in criminal conduct does not warrant a sentence of probation.

Second, the defendant states that he will face "torture and likely death upon his return to
Accra."  (Def. Mem. at 16.)  The Government notes, however, that based on its review of flight
records, the defendant traveled from New York to Accra at least three times for extended trips
since the events that led to the filing of his asylum application, and Rufai has also posted photos
of his trips to Ghana on Facebook which are publically available.  That conduct is irreconcilable
with the claims he is now making to the Court and made in his asylum application he submitted
in 2014.  His first trip to New York was a month-long trip from July 10 to August 10, 2016 (*See*
Exhibit I for examples of photos Rufai posted on Facebook from this trip which were publically
available and "liked" by hundreds of people).  His second trip was from August 31 to October 4,
2017.  And his most recent trip before his arrest was an 18-day trip from December 21, 2017, to
January 9, 2018, when the defendant was arrested upon his reentry to the United States.  Notably,
on his return flight to the United States, Rufai was traveling with codefendants Muftau Adamu
and Mubarak Baturi.  (*See* Exhibit J for photo of Rufai and Adamu at the airport during a
previous trip).  The Government does not have information in its possession regarding the claims
made in Rufai's asylum application, but his regular and publically posted travel to Accra – the
same place he now claims he fears – with coconspirators as late as December 2017 should be
considered by the Court in assessing the credibility of the defendant's claims and his request for
a probationary sentence on this basis.

Finally, the defendant's submission claims that "by all accounts, Rufai is an amazing
father to his two children, one of whom lives with him."  (Def. Mem. at 13.)  Notably, however,

Hon. Denise L. Cote
April 5, 2019
Page 7 of 7

the only account provided to the Probation Department and the Court is the defendant's own. Neither Rufai's purportedly legal wife, Markitta Whitney, with whom he had a son in December 2018 approximately one year after he was arrested and has reconciled[5], nor the mother of his daughter, Hudeiya Adjei, have spoken with Probation or written in support of the defendant. (*See* PSR ¶ 87.) Further, while the defendant states that he has sole custody of his daughter, based on a review of the defendant's text messages from the phones seized in connection with his arrest, it appears that Ms. Adjei and Ms. Adjei's mother took care of the daughter when the defendant traveled to Ghana without her for a total of almost two months in 2017 before his arrest. Those text messages also reflect Ms. Adjei taking care of the daughter at other times throughout 2017, so there does appear to be alternative care available for the daughter. Rufai also had several family members and friends write in support of him. The Government nevertheless recognizes that the defendant's criminal conduct will have unfortunate collateral consequences on his family should he spend time in prison. Such collateral consequences, however, are not unique to the defendant and do not warrant a probationary sentence given the other sentencing factors described above.

## III.   CONCLUSION

For the reasons set forth above, Government respectfully submits that a Guidelines sentence of 41 to 51 months' imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing and would be fair and appropriate in this case.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   _____
      Sagar K. Ravi
      Assistant United States Attorney
      (212) 637-2195

---

[5] Ms. Whitney told the FBI during an interview on January 30, 2018, that Rufai paid her $6,500 to marry him for immigration purposes. (PSR ¶ 55.) In preparation for Rufai's immigration interview, Ms. Whitney stated to the FBI that she and Rufai moved into an apartment together in order to learn more about each other so that they could answer questions that may be asked by immigration authorities.

# EXHIBIT A





# **Exhibit B**

**November 22-24 2017**

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "I Love God," and Muftau Adamu, who was using the moniker "Loyalty"**

ADAMU:     Boa still active?

RUFAI:     Yap

RUFAI:     Y

ADAMU:     Job go come [sends photo of wire transfer]

ADAMU:     Time for pick up

RUFAI:     E no come oo

[…]

ADAMU:     I want fresh account I no want problem again

RUFAI:     U right

ADAMU:     [sends screenshot of text message with Victim-2]

ADAMU:     Check from ur side

[…]

ADAMU:     46,500, 15% u like??

RUFAI:     Cool

ADAMU:     OK

# EXHIBIT C

May 5, 2017

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "ALLAH IS MY PROVIDER," and a coconspirator ("CC-1")**

CC-1:       Besides I have a white man here who makes calls for me on white women that are not interested in halfcast men.  They want raw Caucasians. So he talks on phone and I handle the texting and emails.

CC-1:       And he gets 30%.

RUFAI:     This business be outstanding.

CC-1:       He's a lostman trying to survive and I make him fine two times norrr he say if there's business make I link am up make we do.  Then he started showing live cam to one client and she fell so much and started paying.  Now he doesn't want to go back

CC-1:       But he said he wants to go visit family in Nevada and come back. And I told him we need to settle some clients before he goes. So maybe he will go in July or august.

CC-1:       He even said I should stop using other people's pictures and put up his photo on my Match profile. lol

RUFAI:     Chaaa.  Then u can give me his pic to start workinv witj

# EXHIBIT D

May 13, 2017

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "ALLAH IS MY PROVIDER," and a coconspirator ("CC-1")**

CC-1:        Chairman some moneygram transaction enter!

CC-1:        $1,600 Try go pick up this morning! No dulling! […]

RUFAI:       Money gram?

CC-1:        Yeah moneygram

CC-1:        Senders name: [Victim-3 name] […]

CC-1:        Good […]

CC-1:        What name you sent to?

CC-1:        You use Ramalon of Rufai

RUFAI:       Any of those […]

CC-1:        I sent $400. Ref # is 39958391. I love you. ♥

CC-1:        The same woman info. [Victim-3 name]!

RUFAI:       Ok

RUFAI:       Haha i love u to

# EXHIBIT E

April 29, 2017

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "ALLAH IS MY PROVIDER," and a coconspirator ("CC-1")**

CC-1:       Some woman dey go do some $500 after she close from work at 5pm

RUFAI:      Then i go give u another name

RUFAI:      Joe terry

CC-1:       Oh I give her details already wey she say after work. […]

CC-1:       The Joe Terry too be working name waaa

CC-1:       Them go love send payment for top easily

RUFAI:      Yeah i get him passport

CC-1:       Very good. Then I go start dey use that. Better than your real name

CC-1:       Besides it's very English

RUFAI:      Yeah use tht

# **EXHIBIT F**

June 5, 2017

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "ALLAH IS MY PROVIDER," and a coconspirator ("CC-1")**

CC-1:        My business partners are gong to send some cash into my guys account is Dubai, when it's there he'll be splitting the moneys to send to many accounts I give him. I'll also go to Dubai to take some cash to buy some stuffs to ship

CC-1:        So hopefully before two weeks inshaa Allah your account should receive up to some half million dollars if all goes well

RUFAI:      In sha Allah it will […]

CC-1:        But that kinda money we can't get it direct here.  So you'll be buying some serious cars and important things that costs more for us to get them down here to resell.  Just sell them normal without profit to just get the cash back

RUFAI:      Yeah tht what we gonna do […]

CC-1:        I have some three accounts but it's best to also launder cash through business. Cars etc

RUFAI:      Yeah tht what one of my guy does

RUFAI:      He some times recieved like 600k

RUFAI:      So he dey buy cars and go take checks for bank and make payment for tht them no dey suspect

CC-1:        Yeah. Easy.

# EXHIBIT G

August 25, 2017

**Excerpt of Facebook Messenger chats between Rufai, who was using the moniker "Ramalon Major Key," and a coconspirator ("CC-2")**

CC-2:       And how much % u dey take?

RUFAI:      30

CC-2:       U too dey charge o

RUFAI:      Ebi so u know

RUFAI:      Customers dey spoil account u know tht

CC-2:       Hmmm

CC-2:       Give me the account

RUFAI:      Ok

RUFAI:      [Provides account details for bank account in name of "Joe Terry"]

CC-2:       It's a clean account right?

RUFAI:      Very clean like snow

CC-2:       OK

# EXHIBIT H

August 25, 2017

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "ALLAH IS MY PROVIDER," and a coconspirator ("CC-3")**

CC-3:        Give me MoneyGram address

RUFAI:      [Provides address]

CC-3:        So bro how much wil u take from it

CC-3:        how much u taking […]

RUFAI:      20%

CC-3:        alright

## EXHIBIT I





# **EXHIBIT J**

